COURT
OF APPEALS

SECOND DISTRICT
OF TEXAS

FORT WORTH

 

 

NO.  2-07-177-CR

 

JAMES ANTHONY DAVIS                                                     APPELLANT

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

OPINION

 

                                              ------------

 

I. 
Introduction

A jury found Appellant James Anthony Davis guilty of murder and
assessed his punishment at ninety-nine years= confinement.  The trial court
imposed a sentence in accordance with the jury=s verdict.  In eighteen points,
Davis contends that this court should reverse the trial court=s judgment and either acquit him or remand his case for a new
trial.  We will affirm.

 

 








II. 
Factual and Procedural Background

In the early morning hours of January 28, 2006, Benbrook police
received a 9-1-1 call from a woman screaming for help.  After the woman stopped screaming, the 9-1-1
operators heard a young child saying, Ahe stabbed my momma.@  When police arrived at the
apartment, they discovered the motionless bodies of Latarsha Hampton and James
Davis.  Latarsha, who had several stab
wounds all over her body, including a fatal stab wound to her neck, was
pronounced dead on the scene.  Davis, who
had cuts on both wrists, his neck, and an ear, was taken to the hospital and
released into police custody later that day. 


The police also discovered Latarsha=s four-year old daughter, Tanoah Hampton, in the apartment that
night.  Although she was in shock, Tanoah
was not physically harmed.  Tanoah had
witnessed that night=s events. 








The State charged Davis with Latarsha=s murder.  Based on Tanoah=s statements about the murder, the discoveries of the police officers
investigating the case, the conclusions of the medical examiners, and
revelations about Latarsha and Davis=s own personal history, police theorized that Davis was committing an
act of domestic violence against Latarsha when he killed her and that he then
attempted suicide.  After a jury found
Davis guilty of murder and the trial court sentenced him to ninety-nine years= confinement, Davis perfected this appeal.

III. 
Points of Error Presented

Davis presents the following eighteen points on appeal:

1.     The greater weight and preponderance of the
evidence shows that 

Davis
acted in self-defense.

 

2.      The evidence is insufficient to support
the conviction because Davis acted in self-defense.

 

3.     The greater weight and preponderance of the
evidence shows that Davis acted under the influence of a sudden passion.

 

4.     The trial court erred by denying Davis=s
request for a jury instruction on sudden passion.

 

5.     The trial court erred by sustaining the
State=s
objection to one of Davis=s jury
arguments urging a unanimous verdict.

 

6.     The trial court erred by sustaining the
State=s
objection to (another) one of Davis=s jury arguments urging a
unanimous verdict.

 

7.     The trial court erred by overruling Davis=s
objection to the State=s
jury argument for a non-unanimous verdict.

 

8.     The trial court erred by overruling Davis=s
motion for a mistrial based on an improper jury argument by the State.

 

9.     The trial court erred by overruling Davis=s
objection to the State=s
jury argument attacking Davis over the shoulders of his counsel.

 

10.   The trial court erred by overruling Davis=s
objection to the jury charge=s failure to instruct the
jury on self-defense.

 








11.   The trial court erred by overruling Davis=s
request for a jury instruction on self-defense.

 

12.   The trial court erred by overruling Davis=s
objection to the admissibility of a copy of the judgment and plea waivers from
a prior case where Davis pleaded guilty to a charge of felon in possession of a
firearm. 

 

13.   The trial court erred by not permitting Davis
to elicit on the cross- examination of a detective his opinion as to whether
Davis=s
wounds were self-inflicted.

 

14.   The trial court erred by not permitting Davis
to impeach a detective as to whether Davis=s wounds were self-inflicted.

 

15.   The trial court erred by overruling Davis=s
objections to the competency of a child witness.

 

16.   The trial court erred by permitting the
testimony of a child witness without determining whether the child was a
competent witness.

 

17.   The trial court erred by overruling Davis=s
objections to the testimony of an officer who had responded to a previous
incident of assault by Davis against Latarsha.

 

18.   The trial court erred by
allowing one of Latarsha=s friends to
testify about Latarsha=s statements
to the friend concerning her relationship with Davis and her future plans.        

We will address each of these points in the sequence most logical to
the structure of our opinion.

IV. 
Standards of Review








Many of the eighteen points raised by Davis involve application of the
same standards of review.  To avoid
redundancy in our opinion, we set forth all applicable standards of review here
and refer back to them as needed throughout this opinion.

A.  Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a
conviction, we view all the evidence in the light most favorable to the
prosecution in order to determine whether any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of
fact to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at 319, 99 S. Ct. at
2789; Clayton, 235 S.W.3d at 778. 
The trier of fact is the sole judge of the weight and credibility of the
evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04
(Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App.
2000).








Thus, when performing a legal sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the fact-finder.  Dewberry
v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1131 (2000).  Instead, we Adetermine whether the necessary inferences are reasonable based upon
the combined and cumulative force of all the evidence when viewed in the light
most favorable to the verdict.@  Hooper v. State, 214
S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the fact-finder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

B.  Factual Sufficiency

When reviewing the factual sufficiency of the evidence to support a
conviction, we view all the evidence in a neutral light, favoring neither
party.  Watson v. State, 204
S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d
795, 799 (Tex. Crim. App. 2005).  We then
ask whether the evidence supporting the conviction, although legally
sufficient, is nevertheless so weak that the fact-finder=s determination is clearly wrong and manifestly unjust or whether
conflicting evidence so greatly outweighs the evidence supporting the
conviction that the fact-finder=s determination is manifestly unjust. 
Watson, 204 S.W.3d at 414B15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  To reverse under the second
ground, we must determine, with some objective basis in the record, that the
great weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the evidence is factually insufficient to
support a conviction that is nevertheless supported by legally sufficient
evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

C.  Requests for Submission of
Defensive Theories

1.  Self-Defense








It is axiomatic that, when properly requested, the trial court must
instruct the jury on every defensive theory raised by the evidence, and it
makes no difference whether such evidence or testimony was produced by the
prosecution or the defense, or whether such defensive evidence or testimony
might be strong, weak, unimpeached, or contradicted.  Ferrel v. State, 55 S.W.3d 586, 591
(Tex. Crim. App. 2001); Smith v. State, 676 S.W.2d 584, 586B87 (Tex. Crim. App. 1984). 
However, before a defendant is entitled to a jury instruction on
self-defense, that defendant must provide some evidence that viewed in the
light most favorable to the defendant will support the self-defense claim.  Zuliani v. State, 97 S.W.3d 589, 594
(Tex. Crim. App. 2003); Ferrel, 55 S.W.3d at 591; Hill v. State,
99 S.W.3d 248, 250 (Tex. App.CFort Worth 2003, pet. ref=d).  In other words, a defendant
must provide some evidence that he was statutorily authorized to use deadly
force to defend himself.  See Act
of May 27, 1995, 74th Leg., R.S., ch. 235, ' 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007)
(current version at Tex. Penal Code Ann.
' 9.32 (Vernon Supp. 2008)) (setting forth the requirements for
self-defense at the time applicable to this case).

2.  Sudden Passion








During the punishment phase of the trial, a defendant may argue that
he caused the death while under the immediate influence of sudden passion
arising from an adequate cause.  See Tex. Penal Code Ann. ' 19.02(a)(1), (a)(2), (d) (Vernon 2003); McKinney v. State, 179
S.W.3d 565, 569 (Tex. Crim. App.  2005); Hearne
v. State, No. 02-05-00291-CR, 2006 WL 2578196, at *1 (Tex. App.CFort Worth Sep. 7, 2006, pet. ref=d.) (not designated for publication). 
ASudden passion@ is Apassion directly caused by and arising out of provocation by the
individual killed or another acting with the person killed which passion arises
at the time of the offense and is not solely the result of former provocation.@  Tex. Penal Code Ann. ' 19.02(a)(2). AAdequate cause@ is a Acause that would commonly produce a degree of anger, rage, resentment,
or terror in a person of ordinary temper, sufficient to render the mind
incapable of cool reflection.@  Tex. Penal Code Ann. ' 19.02(a)(1).








Sudden passion is a mitigating circumstance that, if found by the jury
to have been proven by a preponderance of the evidence, reduces the offense
from a first degree felony to a second degree felony.  Id. ' 19.02(c), (d); McKinney, 179 S.W.3d at 569.  Thus, before a defendant is allowed a jury
instruction on sudden passion, he must prove that there was an adequate
provocation; that a passion or an emotion such as fear, terror, anger, rage, or
resentment existed; that the homicide occurred while the passion still existed
and before there was reasonable opportunity for the passion to cool;  and that there was a causal connection
between the provocation, the passion, and the homicide.  McKinney, 179 S.W.3d at 569.  The charge on sudden passion should be given
if there is some evidence to support it, even if the evidence is weak,
impeached, contradicted, or unbelievable. 
Trevino v. State, 100 S.W.3d 232, 238 (Tex. Crim. App.
2003).  However, the evidence should not
be so weak, contested, or incredible that it could not support such a finding
by a rational jury.  McKinney, 179
S.W.3d at 569. 

The mere fact that someone acts in response to provocation of another
is insufficient to warrant a charge on sudden passion.  Trevino, 100 S.W.3d at 241.  Instead, the person=s mental state must render him incapable of rational thought and
collected action.  Kennedy v. State,
193 S.W.3d 645, 653B54 (Tex.
App.CFort Worth 2006, pet. ref=d). The defendant must show some evidence that he was under the
immediate influence of sudden passion.  Trevino,
100 S.W.3d at 241; see McKinney, 179 S.W.3d at 570 (holding that
the victim pushing and yelling at the defendant just before the shooting was
not an adequate cause to give rise to an immediate influence of sudden passion
because the fight began earlier in the day).

D.  Admission of Evidence








We review a trial court=s decision to admit or to exclude evidence under an abuse of
discretion standard.  Weatherred v.
State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).  A trial court does not abuse its discretion
as long as the decision to admit or to exclude the evidence is within the zone
of reasonable disagreement.  Montgomery
v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh=g).  And it cannot be said that
the trial court=s decision
falls outside that zone if it can be supported under any theory of law,
regardless of whether the theory was raised at trial.  Lincicome v. State, 3 S.W.3d 644, 649
(Tex. App.CAmarillo
1999, no pet.).

E.  Jury Argument

Four of the generally permissible areas for the State=s jury argument include:  (1)
summation of the evidence; (2) reasonable deduction from the evidence; (3)
answer to argument of opposing counsel; and (4) plea for law enforcement.  Felder v. State, 848 S.W.2d 85, 94B95 (Tex. Crim. App. 1992), cert. denied, 510 U.S. 829 (1993); Alejandro
v. State, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).  When evaluating an alleged improper argument,
an appellate court views the statement in the context of the entire
argument.  Mosley v. State, 983
S.W.2d 249, 256 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999); Tyler v. State,
No. 02-05-00389-CR, 2006 WL 1452536, at *2 (Tex. App.CFort Worth May 25, 2006, no pet.).








When the trial court sustains an objection to improper jury argument
and instructs the jury to disregard but denies a defendant=s motion for a mistrial, the issue is whether the trial court abused
its discretion in denying the mistrial.  Hawkins
v. State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).  Ordinarily, any injury from an improper jury
argument is obviated when the trial court instructs the jury to disregard the
argument, unless the remark is so inflammatory that its prejudicial effect
cannot reasonably be removed by such an admonishment.  Melton v. State, 713 S.W.2d 107, 114
(Tex. Crim. App. 1986); see Gonzalez v. State, 115 S.W.3d 278, 284 (Tex.
App.CCorpus Christi 2003, pet. ref=d).  Thus, only in extreme
circumstances, when the prejudice caused by the improper argument is incurable,
i.e., Aso prejudicial that expenditure of further time and expense would be
wasteful and futile,@ will a
mistrial be required.  Hawkins,
135 S.W.3d at 77 (quoting Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim.
App. 1999), cert. denied, 529 U.S. 1070 (2000)); see Simpson
v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert. denied,
542 U.S. 905 (2004).

In determining whether the trial court abused its discretion by
denying the mistrial, we balance three factors: 
(1) the severity of the misconduct (prejudicial effect), (2) curative measures,
and (3) the certainty of conviction absent the misconduct.  Hawkins, 135 S.W.3d at 77; Mosley,
983 S.W.2d at 259.

V. 
Legal and Factual Sufficiency of the Evidence








In his first and second points, Davis contends that the evidence proved
that he acted in self-defense when he stabbed Latarsha and that, therefore, the
evidence is insufficient to sustain the jury=s guilty verdict.[1]  The evidence presented to the jury by the
State included the testimony of an eyewitness, several police officers, medical
examiners, and people who personally knew Davis and Latarsha.  Davis did not testify or call any witnesses
on his behalf.  Latarsha=s four-year
old daughter, Tanoah, witnessed her mother=s death.  Tanoah testified that
she was at home with her mother in their apartment when she heard her mother
and her Adaddy@ (Davis) Afussing.@  Tanoah went into the living room, where Davis
and Latarsha were arguing.  She testified
as follows:

Q.     Okay.  Tell us what happened next.

A.     They started fighting.

Q.     Okay.  Then what happened?

A.     Grabbed her hand -- saw my
daddy kill my momma.

. . . .

Q.     Let me ask you this
Tanoah, was your mommy hurt?

A.     Yes, sir.








Q.     Tanoah, who hurt your
mommy?

A.     My daddy.

Q.     And how did he hurt her?

A.     My daddy had killed her.

During cross-examination, Tanoah additionally testified:

Q.     Okay. 
When you came into the room, did mommy have a knife in her hand?

 

A.     No, sir.

 

Q.     Did daddy have a knife in his hand?

 

A.     I don=t know. 

 








The jury additionally heard a recording of the 9-1-1 call Latarsha
made that night.  An audio forensic
expert testified that the tape had recorded the words of a female caller who
identified herself as Tasha Hampton.[2]  The female could be heard on the tape crying,
screaming, and saying, A[G]et off
me.@  The female said, A[P]lease send help,@ A[P]lease . .
. no more . . . no . . . not my child@ (ellipses in 9-1-1 transcript), and AJust don=t hurt her .
. . it=s over . . .@ (ellipses
in 9-1-1 transcript).  Throughout the
phone call, a screaming child and a male voice saying Ahang up the phone@ could be heard in the background. 
The female caller did not say anything else, but the 9-1-1 tape recorded
the child in the background saying, AYou stabbed my momma@ and ADaddy . . . you
have bleed [sic] on me.@ 

In addition to Tanoah=s testimony and the 9-1-1 tape, the police officers on the scene that
night testified.  They explained that
when they arrived both Latarsha=s apartment doors were locked from the inside.  They broke in through the back door and
discovered Latarsha, Davis, and Tanoah in the apartment. Latarsha was on the
floor in the living room; knife wounds were visible on her.  Davis was on top of Latarsha; he had knife
wounds to his wrists, neck, and an ear. 
Officer James Hatton testified that Tanoah was in a state of shock, but
that later that night she told him that Davis had hurt Latarsha by Ahitting@ Latarsha
with a knife in her neck.  (Testimony
from a medical examiner confirmed that the fatal wound on Latarsha was a knife
wound to the neck). Tanoah also told police that Davis had pointed a gun at
Latarsha and said, AI=m going to kill you.@  (Police discovered a loaded
gun on the kitchen counter in the apartment). 
Tanoah reported that Latarsha had tried to run away, but that Davis had
grabbed her.  








Davis was transported from Latarsha=s apartment to the hospital. 
Detective Jerry Graham testified that he met Davis at the hospital.  Detective Graham testified that, although he
did not view Davis=s entire
body, the wounds he did see on Davis, including Davis=s wrist and neck wounds, were in his opinion self-inflicted.  Detective Graham did not testify about Davis=s ear wound; he noted only that he had noticed blood in Davis=s ear. 

Medical examiner Dr. Nizam Peerwani performed the autopsy on
Latarsha.  Dr. Peerwani said that
Latarsha had sustained seven stab wounds, including one to her neck, which was
fatal.  Dr. Peerwani classified several
of the wounds as defensiveCinflicted after Latarsha had curled into a defensive posture.  One of the stab wounds, in fact, was in
Latarsha=s back.  Other stab wounds were
on Latarsha=s hands and
arms and were, in Dr. Peerwani=s words, Aconsistent
with a stab injury where a person is trying to protect the more vital and
delicate parts of the body.@ 

On cross-examination, Dr. Peerwani admitted that an attacker could
also sustain defensive wounds.  When
presented with pictures of Davis=s wounds, Dr. Peerwani indicated that he had not examined Davis and
that too many variables existed to accurately ascertain much about the wounds
from a picture.  When pressed by Davis=s attorney, however, Dr. Peerwani conceded that the cut to Davis=s ear was not a typical self-inflicted wound; he testified that it was
probably inflicted by someone else, but that Davis=s neck wounds were probably self-inflicted. 








Finally, Latarsha=s friend Heather Reed testified that she had heard Davis threaten to
kill Latarsha if she attempted to end their relationship.  Heather overheard a cell phone conversation
Latarsha had with Davis and said Davis was speaking to Latarsha in a violent
manner.  Other testimony established that
Latarsha=s apartment was strewn with boxes, making it look like someone was
either moving in or moving out.  Heather
reported that Davis had moved a large television out of Latarsha=s apartment and that someone was coming back to retrieve the remainder
of Davis=s belongings.  

Davis=s ex-wife,
Jacqueline Anderson, testified that Davis spoke with her on the night of the
murder.  Davis reported that he and
Latarsha were arguing.  Davis had been staying
in a motel room, but wanted to move back to Latarsha=s apartment.  Davis apparently
did not have transportation of his own, and none of his friends would take him
to Latarsha=s
apartment.  In fact, Davis told his
ex-wife that his friends offered to give him money to pay for additional nights
in the motel so that he would not go to Latarsha=s apartment.  But Davis refused
and instead took a cab to Latarsha=s apartment that night.  After
presenting all of this evidence, the State closed its case in chief.  Davis did not testify and did not call any
witnesses on his behalf.








Applying the legal sufficiency standard of review to this evidence,
viewing this evidence in the light most favorable to the prosecution, we hold
that a rational trier of fact could have found that Davis intentionally caused
Latarsha=s death.  See Clayton,
235 S.W.3d at 778.  Tanoah, an
eye-witness,  testified that Davis
attacked and killed Latarsha.  Tanoah=s statements to
police on the night of the murder indicated that Davis had stabbed Latarsha in
the neck. Tanoah=s testimony was corroborated by the 9-1-1
call placed by Latarsha that night, by the testimony of several police
officers, and by the testimony of the medical examiner.

Applying the
factual sufficiency standard of review, the evidence presented at trial that
Davis intentionally caused Latarsha=s death was not so
weak that the jury=s verdict was nonetheless clearly wrong
and manifestly unjust.  See Watson,
204 S.W.3d at 414B15, 417. 
No evidence exists in the record contradicting Tanoah=s account of that
night=s events.  Indeed, all of the evidence supports Tanoah=s version of the
factsCthe only version
of that night=s events proffered at trial.  Therefore, we cannot conclude that the great
weight and preponderance of the evidence contradicts the jury=s verdict.  See id.  Accordingly, we overrule Davis=s first and second
points.

VI. 
Davis=s Self-Defense Claim

In his tenth and eleventh points, Davis claims that the trial court
erred by refusing to instruct the jury on the law of self-defense. 








According to the law in effect on the night of the murder,[3]

(a) A
person is justified in using deadly force against another:

 

(1)
if he would be justified in using force against the other under Section 9.31;

 

(2)
if a reasonable person in the actor=s situation would not have
retreated; and

 

(3)
when and to the degree he reasonably believes the deadly force is immediately
necessary:

 

(A)
to protect himself against the other=s use or attempted use of
unlawful deadly force; or

 

(B)
to prevent the other=s
imminent commission of aggravated kidnaping, murder, sexual assault, aggravated
sexual assault, robbery, or aggravated robbery.

 








Act of May 27, 1995, 74th Leg., R.S., ch. 235, ' 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended
2007).  Section 9.31, at the time that
this statute was effective, provided that a person is justified in using force
against another when and to the degree he reasonably believes the force is
immediately necessary to protect himself against the other=s use or attempted use of unlawful force.  See Act of June 19, 1993, 73rd Leg.,
R.S., ch. 900, ' 1.01,
sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 (amended 2007).  

Thus, looking to the first of these requirements for a self-defense
claimCapplying the then-existing section 9.31 to section 9.32(a)(1)CDavis presented no evidence that his attack on Latarsha was necessary
to protect himself from her.  Indeed, the
only testimony about what occurred in the apartment that night established that
Latarsha did not have a knife in her hand. 
Davis argues, however that Dr. Peerwani=s testimonyCthat a cut
on one of Davis=s ears was
probably not self-inflicted[4]Cis evidence that Latarsha attacked him.  Assuming Dr. Peerwani=s testimony gives rise to the inference claimed by Davis, Davis
nonetheless failed to present any evidence that the force he used against
Latarsha, which consisted of stabbing Latarsha seven times, several times while
she was curled into a defensive position or trying to defend herself, was
immediately necessary to protect himself. 
See Ferrel, 55 S.W.3d at 586.








Furthermore, no evidence exists that a reasonable person in Davis=s situation would not have retreated. 
See Act of May 27, 1995, 74th Leg., R.S., ch. 235, ' 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended
2007).  There was no testimony or
evidence presented that Davis could not have simply left the apartment or moved
into a different room to avoid Latarsha=s supposed attack.  In fact, the
evidence established that when Latarsha called 9-1-1, Davis ordered her
to hang up the phone; when Latarsha tried to run away, Davis grabbed her
and pulled her back.

Viewing the evidence in the light most favorable to Davis, as we must
under the applicable standard of review, no evidence exists that establishes
Davis=s entitlement to a self-defense charge, and the trial court did not
err by refusing one.  See, e.g.,
Ferrel, 55 S.W.3d at 591.  We
overrule Davis=s tenth and
eleventh points.

VII. 
Davis=s Sudden Passion Claim

In his third point, Davis argues that the greater weight and
preponderance of the evidence shows that he acted under the influence of a
sudden passion.  Therefore, Davis
suggests in his fourth point, the trial court erred by not including a sudden
passion jury instruction during the punishment phase. 








We have reviewed
all of the evidenceCviewing it as we must under the
controlling standard of reviewCin the light most
favorable to Davis to determine whether there is some evidence that an adequate provocation existed for Davis=s conduct, that is, that a passion or an emotion such as fear, terror,
anger, rage, or resentment existed; that the homicide occurred while the
passion still existed and before there was reasonable opportunity for the
passion to cool; and that there was a causal connection between the
provocation, the passion, and the homicide. 
See Tex. Penal Code Ann.
' 19.02(a)(1), (a)(2), (d); McKinney, 179 S.W.3d at
569.  No such testimony or evidence
exists; indeed, Davis points to no evidence in the record indicating that
Latarsha acted in a manner that would produce an emotion sufficient to render
the mind of a person of ordinary temper incapable of cool reflection.  See Tex.
Penal Code Ann. '
19.02(a)(1), (a)(2), (d); McKinney, 179 S.W.3d at 569; Kennedy,
193 S.W.3d at 653B54.  Therefore, the trial court did not err by
denying Davis=s request
for a jury instruction on sudden passion. 
We overrule Davis=s third and
fourth points.

VIII. 
Davis=s Objections to Testimony During the Trial

A.  Concerning the Admission of
Tanoah=s Testimony

In his fifteenth and sixteenth points, Davis contends that the trial
court erred by allowing five-year-old Tanoah to testify.  Davis generally argues that the trial court
failed to determine whether Tanoah was a competent witness before allowing her
testimony and thus erred.  Davis also
appears to argue that Tanoah was not competent to testify because she did not
demonstrate that she understood that a penalty existed for not telling the
truth. 








A trial court=s
determination of whether a child witness is competent to testify and its ruling
on the issue will not be disturbed on appeal absent an abuse of
discretion.  Broussard v. State,
910 S.W.2d 952, 960 (Tex. Crim. App. 1995), cert. denied, 519 U.S. 826
(1996); De Los Santos v. State, 219 S.W.3d 71, 80 (Tex. Crim. App.CSan Antonio 2006, no pet.); Woods v. State, 14 S.W.3d 445, 450
(Tex. App.CFort Worth
2000, no pet.).  We review the child=s responses to qualification questions as well as the child=s entire testimony to determine whether the trial court=s ruling constituted an abuse of discretion.  De Los Santos, 219 S.W.3d at 80B81; Fox v. State, 175 S.W.3d 475, 481 (Tex. App.CTexarkana 2005, pet. ref=d); Woods, 14 S.W.3d at 451.








Rule 601 of the Rules of Evidence creates a presumption that a person
is competent to testify.  Tex. R. Evid. 601.  The trial court has no duty to conduct a
preliminary competency examination on its own motion.  McGinn v. State, 961 S.W.2d 161, 165
(Tex. Crim. App. 1998).  Once the
competency of a child witness is challenged, the trial court must assure itself
that the child has (1) the ability to intelligently observe the events in
question at the time of the occurrence, (2) the capacity to recollect the
events, and (3) the capacity to narrate the events.  Torres v. State, 33 S.W.3d 252, 255
(Tex. Crim. App. 2000) (quoting Watson v. State, 596 S.W.2d 867, 870
(Tex. Crim. App. 1980)); Hollinger v. State, 911 S.W.2d 35, 38B39 (Tex. App.CTyler 1995,
pet. ref=d).  The third element,
involving the capacity to narrate, requires that the witness is able to understand
the questions asked, frame intelligent answers to those questions, and
understand the moral responsibility to tell the truth. Watson, 596
S.W.2d at 870; Hollinger, 911 S.W.2d at 39.

After administering the oath to Tanoah, the trial court asked her a series
of questions.  Tanoah successfully
answered questions concerning her name, age, and where she lived.  She said that she knew what it was to tell
the truth and to tell a lie.  The trial
court probed Tanoah=s ability to
distinguish the truth from a lie by asking, AIf I were to tell you I had on a red tie, would that be the truth or
would that be not the truth?@  Tanoah, apparently correctly,
answered ANot the
truth.@  Furthermore, the trial court
twice asked Tanoah whether she was going to tell the truth in court that day,
and both times Tanoah confirmed that she was going to tell the truth. 








One of Davis=s chief complaints
concerning the competency of Tanoah=s testimony is that the trial court did not ask Tanoah whether she
knew that there was a penalty for not telling the truth.  But Davis has not cited any authority, and we
have located none, requiring the trial court to question a child on the child=s understanding of the punishment that will be inflicted should he or
she lie.  Thus, we cannot say that the
trial court=s failure to
so question Tanoah rendered the decision to permit her to testify an abuse of
discretion.       We have reviewed the body of Tanoah=s testimony, and it demonstrates that Tanoah was able to intelligently
observe the events on the night of her mother=s death, and could, for the most part, recollect those events and  narrate them. 
See Watson, 596 S.W.2d at 870; Hollinger, 911 S.W.2d at 38B39.  Considering Tanoah=s responses to the trial court=s qualification questions as well as her testimony as a whole, we hold
that the trial court did not abuse its discretion by finding Tahoah competent
to testify.  See Tex. R. Evid. 601(a)(2); De Los
Santos, 219 S.W.3d at 80.

Davis also claims that the trial court erred by failing to make an
explicit finding on the record that Tanoah was competent to testify.  But after the trial court questioned Tanoah,
it overruled Davis=s objection
to her competency and allowed the State to question her.  Davis later re-urged his competency
objection, and the trial court again overruled it.  By overruling Davis=s objections to Tanoah=s competency and permitting Tanoah to testify, the trial court
implicitly found Tanoah competent to testify. 
See Tex. R. App. P.
33.1(a)(2)(A).  Nothing more is
required.  We overrule Davis=s fifteenth and sixteenth points. 

B.  Concerning the Alleged Restriction of
Cross-Examination

of
Detective Graham

 








In his thirteenth point, Davis contends that the trial court erred by Anot permitting [him] to elicit on cross-examination of Detective
Graham his opinion as to whether [Davis=s] wounds were self-inflicted.@   

Detective Jerry Graham testified that he was the police officer who
interviewed Davis at the hospital. 
Detective Graham testified that he saw the wounds to Davis=s neck and to one of Davis=s wrists and that he saw blood in Davis=s ear.  When asked by the
prosecution, ADid you see
any wounds on James Davis that would be classified as defensive wounds?,@ Detective Graham responded, ANo, sir.@  But on cross-examination, Davis did specifically
inquire into Detective Graham=s opinion as to whether Davis=s wounds were self-inflicted. 
Davis asked, AOf the
wounds that you did see, you told us that they did not appear to be defensive
as far as your opinion; is that correct?@  Detective Graham answered, ACorrect.@  On recross-examination Davis again asked, AAre you talking about the wounds that you saw on the wrist appeared to
be self-inflicted?,@ to which
Detective Graham answered, AThose appeared to be self-inflicted, yes.@ 








Thus, Davis=s complaint
that the trial court erred by Anot permitting [him] to elicit on cross-examination of Detective
Graham his opinion as to whether [Davis=s] wounds were self-inflicted@ is not well-founded in the record. 
The record reflects that the trial court did permit Davis to cross
examine Detective Graham on his opinion as to whether Davis=s wounds were self-inflicted. 
We overrule Davis=s thirteenth
point.

 

C.  Concerning Exclusion of Statements Davis Made
to Detective Graham

 

Davis alleges in his fourteenth point that the trial court erred by
excluding statements that Davis made to Detective Graham; Davis claims the
statements were admissible to impeach Detective Graham=s opinion that the wounds he observed on Davis appeared to be
self-inflicted.  At the hospital, Davis
told Detective Graham that he had cut his own wrists, but made multiple claims
that Latarsha had slashed his neck. 
Detective Graham=s report
reflects these statements by Davis. 
Davis attempted to elicit testimony from Detective Graham concerning the
statements Davis made at the hospital indicating that Latarsha had inflicted
his neck wound.  Davis conceded that his
statements were hearsay but argued they were admissible under Texas Rules of
Evidence 701B705 because
they formed the basis of Detective Graham=s opinion that his wounds were self-inflicted and to impeach Detective
Graham.  The trial court excluded the
statements.  








We review the trial court=s ruling again applying the abuse of discretion standard of
review.  See Santellan v. State,
939 S.W.2d 155, 169 (Tex. Crim. App. 1997); Montgomery, 810 S.W.2d at
392.  The parties concede that Davis=s statements to Detective Graham constitute hearsay.  See Tex.
R. Evid.  801; Allridge v.
State, 762 S.W.2d 146, 152 (Tex. Crim. App. 1988); Chambers v. State,
905 S.W.2d 328, 330 (Tex. App.CFort Worth 1995, no pet.). 
Davis claims, however, that the trial court should have admitted them
pursuant to Texas Rule of Evidence 705(d). 
That rule requires the trial court to exclude facts or data relied upon
by an expert if Athe danger
that [the facts or data] will be used for a purpose other than as explanation
or support for the expert=s opinion
outweighs their value as explanation or support or are unfairly prejudicial.@  Tex. R. Evid. 705(d).








Thus, the trial court here was required to exclude Davis=s statements to Detective Graham unless the value of the statements as
an explanation or support for Detective Graham=s expert opinion outweighed the danger that Davis=s statements would be used for a purpose other than as an explanation
of or support for the opinion.  See
id.  As with a rule 403 balancing
test, a trial court need not conduct a 705(d) balancing test on the
record.  See Valle v. State, 109
S.W.3d 500, 506 (Tex. Crim. App. 2003) (applying a form of analysis
traditionally used in a rule 403 balancing test to rule 705); Yates v. State,
941 S.W.2d 357, 367 (Tex. App.CWaco 1997, pet. ref=d) (holding that a trial court need not perform a 403 balancing test
on the record); Luxton v. State, 941 S.W.2d 339, 343 (Tex. App.CFort Worth 1997, no pet.) (presuming that the trial court mentally
conducted a 403 balancing test even though it was not explicitly done on the
record).

Detective Graham testified:

Q.  And, in your opinion, was [the neck wound] a
self-inflicted        wound?

 

A.  With the wound starting deeper on this side
and getting narrow       toward the neck
and rounding to the front, yes, sir, I believe it       was self-inflicted.[5]


 

Outside the presence of the jury, while the trial court considered the
admissibility of Davis=s statements
to Detective Graham, Detective Graham testified:

Q.  Detective Graham, you testified as to whether
the wounds         were self-inflicted or
not.  Did part of the information in
which        you make that opinion come
from talking to my client?

 

A.  No, sir. 

 

. . .
.

 

Q.  Okay. 
And you=re
saying that what he told you played no part       in the opinion you=ve
just expressed to the jury about self-            inflicted wounds?

 

A.  Yes, it did play a part.

 

Q.  So it was part of your opinion that you just
told the jury?  It          helped you form that opinion?








A.  Yes, sir. 

 

A
little later, the following exchange occurred:

 

THE
COURT: While ago you talked about -- you were talking about  self-inflicted wounds?

 

THE
WITNESS: Yes, sir.

 

THE
COURT: And you stated that you thought they were self-inflicted, is that
correct?

 

THE
WITNESS: Yes, sir.

 

THE
COURT: Because he told you.  Are you
talking about his wrist wounds about being self-inflicted, is that correct, or
are you talking about his wrist wounds along with his neck wounds?

 

THE
WITNESS: I believe that they were all three self-inflicted. 

 








We cannot hold that the trial court abused its discretion by
concluding the value of Davis=s statements to Detective Graham as an explanation or support for
Detective Graham=s opinion
did not outweigh the danger that Davis=s statements would be used for a purposeCthat is, as substantive evidenceCother than as an explanation or support for Detective Graham=s opinion.  See Tex. R. Evid. 705; Valle, 109
S.W.3d at 505B06.  This is especially true because (1) Detective
Graham gave conflicting testimony on whether he considered Davis=s statement in forming his opinion and ultimately admitted that he did
not believe Davis but rather that, based on his observations and experience, he
believed all of the wounds were self-inflicted; and (2) Davis candidly concedes
that he wanted his statements to Detective Graham admitted because they were Aan integral part of the Appellant=s self-defense claim.@  Thus, Davis admits that the
value of the statements was not as an Aexplanation or support@ for Detective Graham=s opinion, but rather as substantive evidence to advance his own
self-defense claimCa purpose
rule 705(d) aims to prevent.  See
Valle, 109 S.W.3d at 505B06 (quoting Cole v. State, 839 S.W.2d 798, 815 (Tex. Crim. App.
1990) (Maloney, J. concurring on rehearing) (AOne of the greatest dangers in allowing otherwise inadmissible
evidence under Rule 705 is that the jury will consider the facts and data as
substantive evidence rather than as merely constituting the underlying basis
for the expert=s opinion@)).








Davis additionally argues that the trial court should have permitted
him to Aimpeach@ Detective
Graham with the statements Aunder the rules in Chapter 6 of the Texas Rules of Evidence.@  Presuming that a citation to
nothing more specific than AChapter 6" is sufficient to meet the briefing requirements of
Texas Rule of Appellate Procedure 38.1(h), we cannot agree that Davis=s statements here have any
value to impeach Detective Graham. 
Davis claims that ADet. Graham
interviewed the Appellant in his hospital bed and determined that some of the
wounds suffered by the Appellant were no[t] self-inflicted which was contrary
to his expressed opinion before the jury.@  The record, however,
establishes that Detective Graham was always of the opinion that Davis=s wounds were self-inflicted; the statements in Detective Graham=s report indicating that Davis=s wounds were not self-inflicted were statements by Davis himself, not
by Detective Graham.  Thus, we cannot
agree that the trial court abused its discretion by prohibiting Davis from
impeaching Detective Graham with Davis=s statements that Latarsha slashed his neck.  Having concluded that the trial court did not
abuse its discretion by ruling Davis=s hearsay statements 
inadmissible under rule 705 or as impeachment evidence, we overrule
Davis=s fourteenth point.

D.  Concerning Officer Mullinax=s Testimony

In his seventeenth point, Davis contends that the trial court erred by
admitting Officer Michael Mullinax=s testimony.  Approximately six
months before Latarsha=s death,
Officer Mullinax responded to a 9-1-1 call made by Latarsha.  When Officer Mullinax responded to Latarsha=s prior 9-1-1 call, Latarsha made various statements to him.  Davis timely objected to Officer Mullinax=s testimony concerning Latarsha=s statements on hearsay and Across-examination and confrontation@ grounds.  The trial court
overruled Davis=s
objections, but granted him a running objection.  Davis contends that the trial court erred by
overruling his objections.  








Officer Mullinax testified that when he arrived at Latarsha=s apartment, she told him that she and Davis had gotten into an
argument, that she had asked Davis to leave, and that Davis had become angry
and pushed her into a wall.  Latarsha
further told Officer Mullinax that she had hit her head on the wall, fallen to
the ground, and cut her finger.  She
showed the cut to Officer Mullinax. 
Latarsha explained that when she had tried to call the police Davis had
pulled the phones from the wall; after a friend arrived, Latarsha used the
friend=s cell phone to call 9-1-1. 
Officer Mullinax spoke with Latarsha as they stood outside her
apartment; Davis was not present because he had left the apartment.  Later, however, while Officer Mullinax was
still at Latarsha=s apartment,
Davis returned and was arrested. 

1.  Hearsay Objection to Officer Mullinax=s Testimony








We review a trial court=s ruling on the admissibility of an out-of-court statement under the
exceptions to the general hearsay exclusion rule for an abuse of
discretion.  Zuliani, 97 S.W.3d at
595.  Hearsay is a statement, other than
the one made by the declarant while testifying at a trial or hearing, offered
into evidence to prove the truth of the matter asserted.  Tex.
R. Evid. 801(d).  In order for
hearsay to be admissible, it must fit into an exception provided by a statute
or the Rules of Evidence.  Id.
802; Zuliani, 97 S.W.3d at 595. 
One such exception is rule 803(2)Cthe excited utterance exception. 
An Aexcited
utterance@ is A[a] statement relating to a startling event or condition made while
the declarant was under the stress of excitement caused by the event or
condition.@  Tex.
R. Evid. 803(2).  

In determining whether a hearsay statement is admissible as an excited
utterance, the court may consider the time elapsed and whether the statement
was in response to a question.  Zuliani,
97 S.W.3d at 595; Salazar v. State, 38 S.W.3d 141, 154 (Tex. Crim. App.
2001).  However, it is not dispositive
that the statement is an answer to a question or that it was separated by a
period of time from the startling event; these are simply factors to consider
in determining whether the statement is admissible under the excited utterance
hearsay exception.  Zuliani, 97
S.W.3d at 596.

The critical determination is Awhether the declarant was still dominated by the emotions, excitement,
fear, or pain of the event@ at the time of the statement.  Zuliani,
97 S.W.3d at 596.  Stated differently, a
reviewing court must determine whether the statement was made Aunder such circumstances as would reasonably show that it resulted
from impulse rather than reason and reflection.@  Id. (quoting Fowler
v. State, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)).








Here, the evidence established that when Officer Mullinax responded to
Latarsha=s 9-1-1 call he found Latarsha Aclearly upset,@ her hands
were shaking badly, and she was crying. 
The record does not indicate what period of time elapsed between the
altercation and Latarsha=s statement,
but a reasonable inference exists that 9-1-1 response time is fairly
quick.  Based on these facts, we cannot
say that the trial court acted outside the zone of reasonable disagreement by
overruling Davis=s hearsay
objection to Officer Mullinax=s recitation of Latarsha=s hearsay statement that Davis had gotten angry and pushed her into a
wall and by admitting it as an excited utterance.[6]  See, e.g., Zuliani, 97 S.W.3d at 596
(holding that the statements of a Ascared to death@ declarant
whispering Ahelp me@ to police officers twenty hours after being assaulted were excited
utterances); Jackson v. State, 110 S.W.3d 626, 634 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d) (holding that the statements of a recently assaulted, Avery upset,@ and crying
assault victim were excited utterances); see also Reyes v. State, 48
S.W.3d 917, 920 (Tex. App.CFort Worth 2001, no pet.); Bondurant v. State, 956 S.W.2d 762,
766 (Tex. App.CFort Worth
1997, pet. ref=d). 

2.  Confrontation Clause
Objection to Officer Mullinax=s Testimony








Whether Officer Mullinax=s testimony violated Davis=s Confrontation Clause rights, however, is an altogether separate
inquiry from whether the testimony was properly admitted under the rules of
evidence.  See Wall v. State, 184
S.W.3d 730, 742 (Tex. Crim. App. 2006) (recognizing statement could be
admissible as an excited utterance and still constitute a testimonial statement
for purposes of a Confrontation Clause analysis).  Thus, we next conduct an analysis of whether
the trial court erred by overruling Davis=s Confrontation Clause objection to Officer Mullinax=s testimony.

Recently, in a case involving facts similar to the present facts, the
Court of Criminal Appeals explained that the proponent of evidence ordinarily
has the burden of establishing the admissibility of the proffered
evidence.  Vinson v. State, 252
S.W.3d 336, 339 (Tex. Crim. App. 2008). 
Once an objection is made, the proponent must demonstrate by a
preponderance of the evidence that the proffered evidence overcomes the stated
objection.  Id. at 340 n.14
(quoting Bourjaily v. United States, 483 U.S. 171, 175, 107 S. Ct. 2775,
2778 (1987)). 








We review a constitutional legal ruling, such as whether a statement
is testimonial or nontestimonial, de novo.  Lilly v. Virginia, 527 U.S. 116, 137, 119
S. Ct. 1887, 1900 (1999); Vinson, 252 S.W.3d at 339; Wall, 184
S.W.3d at 742.  This is particularly so
because the legal ruling of whether a statement is testimonial under Crawford
is determined by the standard of an objectively reasonable declarant standing
in the shoes of the actual declarant.  Wall,
184 S.W.3d at 742B43.  On that question trial judges are no better
equipped than are appellate judges, and the ruling itself does not depend upon
demeanor, credibility, or other criteria peculiar to personal observation.  Id. 
A[T]he surrounding circumstances relevant to a Sixth Amendment
admissibility determination do not include the declarant=s in-court demeanor (otherwise the declarant would be testifying) or any
other factor uniquely suited to the province of trial courts.@  Lilly, 527 U.S. at 137,
119 S. Ct. at 1900.  Therefore, an
appellate court reviews de novo whether, on the record before it, the State
overcame a defendant=s
Confrontation Clause objection by a preponderance of the evidence.  Id.; Vinson, 252 S.W.3d at 340.

The Confrontation Clause of the Sixth Amendment provides: AIn all criminal prosecutions, the accused shall enjoy the right . . .
to be confronted with the witnesses against him.@  U.S. Const. amend. VI. 
Even when hearsay offered against a defendant is admissible under
evidentiary rules, that evidence may implicate the Confrontation Clause of the
Sixth Amendment if the defendant is not afforded the opportunity to confront
the out-of-court declarant.  Gonzalez
v. State, 195 S.W.3d 114, 116 (Tex. Crim. App.), cert. denied, 127 S. Ct.
564 (2006).








In Crawford v. Washington, the Supreme Court held that the
Confrontation Clause barred the Aadmission of testimonial statements of a witness who did not appear at
trial unless he was unavailable to testify and the defendant had had a prior
opportunity for cross-examination.@  541 U.S. 36, 53B54, 124 S. Ct. 1354, 1365 (2004). 
The Court later clarified what qualified as a Atestimonial@ statement
in Davis v. Washington, where it established:

Statements
are nontestimonial when made in the course of police interrogation under
circumstances objectively indicating that the primary purpose of the
interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances
objectively indicate that there is no such ongoing emergency, and that the
primary purpose of the interrogation is to establish or prove past events
potentially relevant to later criminal prosecution.

 

547 U.S. 813, 822, 126 S. Ct. 2266, 2273B74 (2006).








The issue here in determining whether Latarsha=s statements to Officer Mullinax were testimonial is whether, at the
time Latarsha made the statements, circumstances were present that would
indicate the existence of an ongoing emergency. 
See Vinson, 252 S.W.3d at 339. 
We look to the nonexclusive factors of (1) whether the situation was
still in progress; (2) whether the questions sought to determine what is
presently happening as opposed to what has happened in the past; (3) whether
the primary purpose of the interrogation was to render aid rather than to
memorialize a possible crime; (4) whether the questioning was conducted in a
separate room, away from the alleged attacker; and (5) whether the events were
deliberately recounted in a step-by-step fashion.  See Vinson, 252 S.W.3d at 339 (citing Davis,
547 U.S. at 822, 126 S. Ct. at 2274B75).  Each of these factors
establishes the testimonial nature of Latarsha=s statements to Officer Mullinax. 
First, the situation was not still in progress; Davis had left the
apartment before Officer Mullinax arrived. 
Second, because the situation had concluded, Officer Mullinax=s questions to Latarsha were about what had already happened.  Third, the primary purpose of the
interrogation was to memorialize the assault committed by DavisCin fact Davis was arrested that day based on Latarsha=s statements.  Fourth, Latarsha
and Officer Mullinax spoke outside Davis=s presence and fifth, Latarsha did recount the events in a
step-by-step fashion.  Consequently,
applying a de novo standard of review to the trial court=s legal question of whether Latarsha=s statements to Officer Mullinax were testimonial, we hold that they
were.  See Vinson, 252
S.W.3d at 339 (applying these factors and holding statements made by victim to
officer responding to 9-1-1 call were testimonial); Mason v. State, 225
S.W.3d 902, 911 (Tex. App.CDallas 2007, pet. ref=d) (statements given to a police officer responding to a 9-1-1 call
reporting domestic violence were testimonial).








Our holding that Latarsha=s statements to Officer Mullinax were testimonial does not, however,
end our analysis.  In both Crawford
and Davis, the United States Supreme Court recognized that the equitable
exception of forfeiture by wrongdoing Aextinguishes confrontation claims.@  Davis, 547 U.S. at 833,
126 S. Ct. at 2280; Crawford, 541 U.S. at 62, 124 S. Ct. at 1370.  That is, one who obtains the absence of a
witness by wrongdoing forfeits the constitutional right to confrontation.  Davis, 547 U.S. at 833, 126 S. Ct. at
2280.  Consequently, we must analyze
whether Davis forfeited his constitutional right to confront Latarsha by
killing her.








The forfeiture by wrongdoing doctrine dates back to the 1600s and has
been firmly rooted in Supreme Court jurisprudence since the late 1800s.  See Reynolds v. United States, 98 U.S.
145 (1878); Lord Morely=s Case, 6 State Trials 769
(1666).  In fact, until recently, the
leading American case on the forfeiture doctrine was Reynolds, handed
down by the Supreme Court in 1878.  See
Reynolds, 98 U.S. 145.  In Reynolds,
the Court explained that the rule Ahas its foundation in the maxim that no one shall be permitted to take
advantage of his own wrong . . . [the doctrine] is the
outgrowth of a maxim based on the principles of common honesty.@  Id.  Thus, this Aessentially equitable@ principle mandates that Aone who obtains the absence of a witness by wrongdoing forfeits the
constitutional right to confrontation.@  Davis, 547 U.S. at 833,
126 S. Ct. at 2280.

As the rule evolved in the nation=s case law after Reynolds, courts agreed that forfeiture
required (1) the declarant=s unavailability (2) as a result of the defendant=s act of misconduct.  Gonzalez,
195 S.W.3d at 120.  Courts disagreed,
however, on whether there must be an additional showing that the defendant=s actions were undertaken for the purpose of preventing the
witness from testifying at trial.  See
id. at 121B25 (setting
forth an extremely thorough examination of the doctrine=s development across state and federal courts). 

During the pendency of this appeal, the Supreme Court resolved the
issue and held that such an additional showing is required for the forfeiture
doctrine.  Giles v. California,
128 S. Ct. 2678, 2683 (2008).  That is, a
defendant does not waive his Confrontation Clause rights under the forfeiture
by wrongdoing exception unless the defendant engaged in the wrongful conduct
specifically for the purpose of preventing the witness from testifying.  Id.








Here, there is no evidence that Davis murdered Latarsha to prevent her
from testifying.  Therefore, applying the
United States Supreme Court=s holding in GilesCwhich is binding on this courtCto the present facts, and in the absence of evidence that Davis killed
Latarsha specifically to prevent her from testifying, we cannot hold that Davis
forfeited his right to confront Latarsha by killing her.  See id. 
Having held that Davis timely asserted a Confrontation Clause
objection to Officer Mullinax=s testimony, that Latarsha=s statements to Officer Mullinax were testimonial, and thatCapplying the holding in GilesCDavis did not forfeit his right to confront Latarsha by killing her,
we hold that the trial court erred by overruling Davis=s Confrontation Clause objection to Officer Mullinax=s testimony about Latarsha=s statements to him.  








Having found error, we must conduct a harm analysis to determine
whether the error is harmless.  Tex. R. App. P. 44.2(a).  Because the error is constitutional, we apply
rule 44.2(a), under which we must reverse unless we determine beyond a
reasonable doubt that the error did not contribute to appellant=s conviction or punishment.  Tex. R. App. P. 44.2(a).  In applying a rule 44.2(a) harm analysis to
hearsay erroneously admitted over the defendant=s Confrontation Clause objection, the Court of Criminal Appeals has
instructed us that if the verdict or punishment would have been the same absent
the error then the error is harmless.  Clay
v. State, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007) (reversing appellate
court=s conclusion that hearsay erroneously admitted over Confrontation
Clause objection was not harmless under rule 44.2(a) standard).  In our assessment of the likelihood that,
absent the trial court's error, the jury=s verdict as to appellant=s conviction and punishment would have been the same, we must consider
the entire record.  Id.  Among the factors, as revealed by the record,
that we must consider are:  (1) the
importance of the hearsay evidence to the State=s case; (2) whether the hearsay evidence was cumulative of other
evidence; (3) the presence or absence of other evidence corroborating or
contradicting the hearsay evidence on material points; and (4) the overall
strength of the State's case.  Id.;
Scott v. State, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).  We must also consider any other factor, as
revealed by the record, that may shed light on the probable impact of the trial
court=s error on the minds of average jurors.  Clay, 240 S.W.3d at 904 .













Here, the hearsay (Latarsha=s statements to Officer Mullinax) was not important to the State=s case.  The hearsay did not
establish any element of the offense of the charged murder; instead the hearsay
involved a prior 9-1-1 call made by Latarsha. 
Although the hearsay was not Acumulative,@ it was
similar in nature to the testimony of Benbrook Police Officer Walter
Keffer.  Officer Keffer testified that
just four days before the murder, he was dispatched to Latarsha=s apartment based on a  9-1-1
call reporting an unwanted person at her apartment.  He met with Latarsha and Davis and took Davis
away from the apartment.  Additionally,
the hearsay was similar in nature to testimony provided by Latarsha=s friend Heather Reed.  Heather
testified extensively about Davis=s conduct towards Latarsha. 
Heather testified that she had heard Davis verbally abuse Latarsha on
multiple occasions, yelling that Latarsha would never leave him except in a
body bag and threatening to blow up Latarsha=s apartment if she tried to leave him. 
And another of Latarsha=s friends, Kimberly Hudson, testified that Davis had a volatile temper
and called Latarsha his Ainvestment@ and that on the night of the murder as she stood waiting for someone
to answer her knock on the door of Latarsha=s apartment she overheard Latarsha saying, Ano, no, James, no.@  Thus, although Latarsha=s exact hearsay statements to Officer Mullinax were not technically Acumulative of@ or Acorroborated by@ other
evidence, the inferences the jury was likely to draw from Latarsha=s statements to Officer Mullinax are the exact same inferences the
jury likely did draw from the other testimony, outlined above, that was
admitted.  Finally, the State=s case against Davis was very strong. 
An eyewitnessCTanoahCtestified that Davis stabbed Latarsha in the neck.  Tanoah=s version of the events was corroborated by the 9-1-1 tape made when
Latarsha called police during Davis=s attack.  And when police
arrived at the scene, all of the apartment doors were locked from the inside
and only Tanoah, Latarsha, and Davis were inside the apartment.  Testimony from police officers and the
medical examiner further confirmed the accuracy of the events as explained by
Tanoah.  Reviewing the entire record in a
neutral manner and applying the factors as instructed by the Court of Criminal
Appeals in Clay, we hold beyond a reasonable doubt that the trial court=s error in admitting Officer Mullinax=s testimony about the hearsay statements Latarsha made to him when he
responded to her 9-1-1 call approximately six months before her murder did not
contribute to Davis=s conviction
or punishment.  See Tex. R. App. P. 44.2(a); Clay,
240 S.W.3d at 904. Accordingly, we overrule Davis=s seventeenth point.

E.  Concerning Heather Reed=s Testimony

In his eighteenth point, Davis contends that the trial court erred by
admitting the testimony of Heather Reed, a close personal friend of
Latarsha.  Heather testified about
Latarsha and Davis=s
relationship.  Davis objected to various
portions of Heather=s testimony,
as set forth below, urging (as he does on appeal) that the testimony was
hearsay and violated his Confrontation Clause rights. 

1.     Heather testified that in October 2005
Latarsha came to Heather=s
apartment and asked if she and Tanoah could stay the night because Davis was
being verbally abusive.  Heather said
yes, and while Latarsha was at Heather=s apartment, Davis called
Latarsha several times.  According to
Heather, Latarsha would Ahang
up and hang up, then she=d
speak to him, >I can=t
talk to you when you=re
like this.=@ 

 

2.     Heather testified that she overheard a
phone conversation around  Valentine=s day
of 2005 between Davis and Latarsha. 
Heather said that she heard Davis Atalking real violent to
[Latarsha]@ and
calling her names.  Heather testified
that she knew this because A[Latarsha=s]
cell phone was turned up real loud, you could hear everything when the cell
phone is turned up loud.@ 

 








3.     Heather
testified that later the same day she went to Latarsha=s
apartment and heard Davis tell Latarhsa, AIt=ll
never be over, it=ll
never be over.  The only way you=re
going to leave me is one way.@  Davis later added, AThe
only way you=re
going to leave me is in a body bag.@ 

 

4.     Heather
testified that she overheard another cell phone call between Latarsha and Davis
in October 2005 and heard A[Davis] threaten[] [Latarsha]
again talking about the only way you=re going to leave me is in a
body bag.@ 

 

5.     Heather
testified that she had never known Davis to work and that Latarsha paid all the
household bills. 

 

6.     Heather
testified that Latarsha was in medical school when she met her and that
Latarsha was planning on going back to medical school.  

 

7.      Heather testified that Davis had proposed
marriage to Latarsha, but that Latarsha wanted to take a Await
and see@
approach. 

 

8.     Heather
testified that, on the day of Latarsha=s death, she went to Latarsha=s
apartment and noticed that Latarsha=s television set was
missing.   According to Heather, she
asked Latarsha, AWhere
is your TV at?@  Latarsha responded, A[Davis]
took it, he and a friend come over and took it.@  Latarsha additionally related that Davis had
a friend come over to the house to get the rest of his belongings. 

 

On appeal, Davis claims that the trial court erred by admitting
Heather=s testimony recited above because the itemized testimony constitutes
hearsay and violates his Confrontation Clause rights.  Davis, however, did not object at trial to
Heather=s testimony as set forth in paragraphs 5, 6, 7, and 8.  Therefore, these complaints are forfeited on
appeal.  See Tex. R. App. P. 33.1(a)(1).








Heather=s testimony,
as reflected in paragraphs 2, 3, and 4, reflects out-of-court statements made
by Davis himself that were personally heard by Heather.  Consequently, Heather=s testimony concerning Davis=s out-of-court statements was admissible as admissions by a party
opponent.  See Tex. R. Evid. 801(e)(2)(A); Trevino,
991 S.W.2d at 853 (noting that A[a] party=s own
statements are not hearsay and they are admissible on the logic that a party is
estopped from challenging the fundamental reliability or trustworthiness of his
own statements@).  Accordingly, the trial court did not abuse
its discretion by overruling Davis=s hearsay objections to Heather=s testimony reflected in paragraphs 2, 3, and 4, above.

Concerning Davis=s
Confrontation Clause objections to Heather=s testimony as set forth in paragraphs 2, 3, and 4, above, we have not
located and Davis has not cited any authority for the proposition that the
admission of a defendant=s
out-of-court statement through a witness who personally heard the statement
somehow violates the defendant=s right to confront and cross-examine himself about the out-of-court
statement he made.  Accordingly, the
trial court did not err by overruling Davis=s Confrontation Clause objections to Heather=s testimony reflected in paragraphs 2, 3, and 4.













Concerning Davis=s hearsay
objections to Heather=s testimony
as set forth in paragraph 1, assuming the trial court abused its discretion by
admitting Heather=s testimony
about Latarsha=s comments
to Davis, we proceed to a harm analysis. 
Because error in admitting a statement in violation of the hearsay rules
of evidence is non-constitutional, we apply rule 44.2(b).  Tex. R. App. P. 44.2(b);
West v. State, 121 S.W.3d 95, 104 (Tex. App.CFort Worth 2003, pet. ref=d) (applying a rule 44.2(b) harm analysis after determining that the
trial court impermissibly allowed a hearsay statement).  The reviewing court must deem the error
harmless if, after reviewing the entire record, the court is reasonably assured
the error did not influence the jury's verdict or had but a slight effect.
Thus, we disregard the error if it did not affect appellant=s substantial rights.  Tex. R. App. P. 44.2(b); see Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070 (1999); Coggeshall v. State,
961 S.W.2d 639, 642B43 (Tex.
App.CFort Worth 1998, pet. ref=d).  In making this
determination, we review the record as a whole.  See Johnson v. State, 967 S.W.2d 410, 417
(Tex. Crim. App. 1998).  As the Texas
Court of Criminal Appeals has held, properly admitted evidence of an appellant=s guilt is one factor to consider in performing a harm analysis under
rule 44.2(b).  Motilla v. State,
78 S.W.3d 352, 358 (Tex. Crim. App. 2002). 
Reviewing the record as a whole, including the evidence of Davis=s guilt as already set forth in detail herein, any trial court error
in permitting Heather to testify that Davis called Latarsha and that she heard
Latarsha saying, AI can=t talk to you when you=re like this@ did not
influence the jury=s
verdict.  Accordingly, even if the trial
court abused its discretion by overruling Davis=s hearsay objection to Heather=s testimony reflected in paragraph 1, any error was harmless.  

Finally, concerning Davis=s Confrontation Clause objections to Heather=s testimony set forth in paragraph 1, the Sixth Amendment bars the
admission testimonial statements of a witness who did not testify at
trial and was not subject to cross-examination by the defendant.  Crawford, 541 U.S. at 53B54, 124 S. Ct. at 1365 (emphasis added).  Casual remarks made to friends are generally
not testimonial.  See id. at 51,
124 S. Ct. at 1365 (saying that A[a]n accuser who makes a formal statement to government officers bears
testimony in a sense that a person who makes a casual remark to an acquaintance
does not@); Davis v. State, 169 S.W.3d 660, 667 (Tex. App.CAustin 2005, pet. ref=d).  








In this case, Latarsha=s statements that Heather overheard were in the context of a cell
phone conversation Latarsha was conducting in the presence of a friend.  There is no indication whatsoever that
Latarsha made her comments to Davis (that were overheard by Heather) under circumstances
that would have led an objective witness to believe that they would be
available for use at a later trial.  See
Crawford, 541 U.S. at 52, 124 S. Ct. at 1364.  Heather=s testimony concerning Latarsha=s statements therefore did not violate Davis=s Confrontation Clause rights. 
Accordingly, the trial court did not err by overruling Davis=s Confrontation Clause objections to Heather=s testimony reflected in paragraph 1. 


We overrule Davis=s eighteenth point.

IX. 
Jury Argument

A.  Jury Unanimity Argument

In points number five, six, and seven, Davis contends that the trial
court erred by sustaining the State=s objections to Davis=s jury unanimity arguments and, likewise, by overruling Davis=s objections to the State=s jury unanimity argument.  The
trial court charged the jury that 

If
you believe from the evidence beyond a reasonable doubt that on or about the
28th day of January 2006, in Tarrant County, Texas, the defendant, JAMES
ANTHONY DAVIS, did then and there intentionally or knowingly cause the death of
an individual, Latarsha Hampton, by cutting or stabbing her with a knife; or

 

If
you believe from the evidence beyond a reasonable doubt that on or about the
28th day of January 2006, in Tarrant County, Texas, the defendant, JAMES
ANTHONY DAVIS, did then and there intentionally, with the intent to cause
serious bodily injury to Latarsha Hampton, commit an act clearly dangerous to
human life, namely, cutting or stabbing Latarsha Hampton with a deadly weapon,
to wit: a knife, that in the manner of its use or intended use was capable of
causing death or serious bodily injury, which caused the death of Latarsha
Hampton, then you will find the defendant guilty of the offense of murder as
charged in the indictment.








And the record reflects the following colloquy during closing
arguments:

[DAVIS=S
ATTORNEY]: The prosecutor mentioned to you there=s two
ways that the State is going to seek to establish murder.  One is intentionally causing -- intentional
and knowing [sic] causing death [sic] of another person . . . The other, . . .
is you do something intentionally that=s clearly dangerous to human
life and as a result of that, a person dies . . . But let me tell you
something, all 12 of you have got to figure out which one of those versions is
murder.  It=s not
six of you go one way and six of you go another. 

 

[STATE=S
ATTORNEY]: Your Honor, I=m
going to have to object to that as a misstatement of the law.

 

THE
COURT: Sustained.

 

[DAVIS=S
ATTORNEY]: That is the law, Your Honor.

 

THE
COURT:  I sustained the objection.  Go ahead.

 

[DAVIS=S
ATTORNEY]: All 12 of you have got to agree on the one method by which the
murder occurred.

 

[STATE=S
ATTORNEY]: I=m
going to have to object, Your Honor, that=s a misstatement of the law.

 

THE
COURT: Sustained. 

 

Davis further contends that the trial court erred by overruling his
objection during the State=s closing argument:

[STATE=S
ATTORNEY]: And if six of you say, well, I believe it was an intentional killing
and six of you said that it=s an act clearly dangerous to
human life, you can find him guilty of murder.

 

[DAVIS=S
ATTORNEY]: Your Honor, we object, Your Honor, we object, that=s a
violation of requiring unanimity of a verdict.

 








THE
COURT: You=re
overruled. 

 

Jury unanimity is required in all criminal cases.  Ngo v. State, 175 S.W.3d 738,
745 (Tex. Crim. App. 2005).  AUnanimity in this context means that each and every juror agrees that
the defendant committed the same, single, specific criminal act.@  Id.  Jury unanimity is not violated, however, when
the jury disagrees on alternate theories of the defendant=s mens rea at the time of the offense.  Martinez v. State, 129 S.W.3d 101, 103
(Tex. Crim. App. 2004); De Los Santos v. State, 219 S.W.3d 71, 76 (Tex.
App.CSan Antonio 2006, no pet.).  

The Supreme Court explained this principle in Schad v. Arizona,  501 U.S. 624, 111 S. Ct. 2491 (1991).  There, the Court said that where the actus
reus was Amurder,@ all twelve jurors had to agree that the defendant had committed the
murder.  Id. at 630, 111 S. Ct. at
2496.  The jury did not need to be
unanimous on the issue of whether the defendant murdered with premeditation or
in the course of committing a robbery, as such a distinction merely went to how
the defendant committed the murder, not whether he committed the
murder.  Id. at 631B32, 111 S. Ct. at 2497.  The
Court said,








We
have never suggested that in returning general verdicts in such cases the
jurors should be required to agree upon a single means of commission . . . In
these cases, as in litigation generally, Adifferent jurors may be
persuaded by different pieces of evidence, even when they agree upon the bottom
line.  Plainly, there is no general
requirement that the jury reach agreement on the preliminary factual issues
which underlie the verdict.@

 

Id. (quoting McKoy v. North
Carolina, 494 U.S. 433, 449, 110 S.Ct. 1227, 1236B37 (1990) (Blackmun, J., concurring)); see Ngo, 175 S.W.3d at
746.

Our analysis, then, must begin with an examination of the statute
under which Davis was indicted in order to determine the elements of the crime
he was charged with and whether the legislature has created a single offense
with multiple mens rea possibilities or separate offenses that vary
according to the offending party=s mental state.  See
Jefferson v. State, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006) (quoting State
v. Johnson, 627 N.W.2d 455, 459B60 (Wis. 2001), cert. denied, 534 U.S. 1043 (2001)).

Section 19.02 of the Texas Penal Code, titled AMurder,@ states that


[a]
person commits an offense if he:

 

(1)
intentionally or knowingly causes the death of an individual; [or]

 

(2)
intends to cause serious bodily injury and commits an act clearly dangerous to
human life that causes the death of an individual.

 








Tex. Penal Code Ann. '
19.02(b)(1)-(2) (Vernon 2003).  In this
statute, the legislature has set forth two different mental statesC(1) intentionally or knowingly causing death or (2) committing an act
clearly dangerous to human life with the intent to cause serious bodily injuryCthat would satisfy the intent element of murder.  See White v. State, 208 S.W.3d 467,
467B68 (Tex. Crim. App. 2006); Gray v. State, 980 S.W.2d 772, 774B75 (Tex. App.CFort Worth
1998, no pet.).  Where the legislature
has specified that any of several different mental states will satisfy the
intent or mens rea element of a particular crime, unanimity is not
required on the specific alternate mental state as long as the jury unanimously
agrees that the State has proved the intent element beyond a reasonable
doubt.  Jefferson, 189 S.W.3d at
311 (quoting Johnson, 627 N.W.2d at 459B60).  That is, the jury did not
need to unanimously agree on the preliminary factual issue of Davis=s mental state when he stabbed Latarsha, as long as it agreed on the
bottom lineChe murdered
her.  See id.; Aguirre, 732
S.W.2d 320, 326 (Tex. Crim. App. 1987); Gray, 980 S.W.2d at 774B75. 








The jury here was authorized in the charge of the court to find Davis
guilty of murder if he Aintentionally
or knowingly cause[d] the death of an individual or intentionally, with intent
to cause serious bodily injury, commit[ted] an act clearly dangerous to human
life and cause[d] the death of an individual@;  the jury returned a general
verdict finding Davis Aguilty of
the offense of murder as charged in the indictment.@  The jury unanimity requirement
is not violated where, as here, the defendant was indicted under a statute
providing alternate means of committing the same offense.  See Schad, 501 U.S. at 631B32, 111 S. Ct. at 2497; Jefferson, 189 S.W.3d at 311; Gray,
980 S.W.2d at 774B75.        Davis
relies solely on Ngo to support his claim on appeal.  Such reliance is misplaced, however, as the
indictment and underlying statute involved in Ngo are distinguishable
from those involved in this case.  The
State in Ngo indicted the defendant for credit card abuse by any one of
three separate acts as statutorily enumerated.  175 S.W.3d at 742.  Specifically, the statute under which the
defendant was indicted alleged three different criminal acts:  stealing a credit card, receiving a stolen
credit card, or presenting a credit card without the cardholder=s consent and with the intent to fraudulently obtain a benefit from
the credit card=s use.  Id. at 744.  In this case, however, Davis was indicted for
a single act:  the murder of Latarsha
Hampton.  Ngo is therefore
distinguishable.  Thus, the trial court
did not err by sustaining the State=s objections or by overruling Davis=s objection.  Accordingly, we
overrule Davis=s fifth,
sixth, and seventh points.

B.  Attacking Davis Over Counsel=s Shoulders

In his ninth point, Davis contends that the trial court erred by
overruling his objection to a comment made by the prosecutor during closing
statements that attacked Davis over the shoulder of his attorney.








Striking at a defendant over defense counsel=s shoulders is impermissible, as it falls outside the generally
permissible areas jury argument.  Wilson
v. State, 938 S.W.2d 57, 62 (Tex. Crim. App. 1996), abrogated on other
grounds Motilla v. State, 78 S.W.3d 352 (Tex. Crim. App.2002).  It is difficult to articulate a precise rule
to determine when a prosecutor is striking over the defense counsel=s shoulder and when he is making a proper jury argument.  Phillips v. State, 130 S.W.3d 343, 356
(Tex. App.CHouston
[14th Dist.] 2004, pet ref=d) (op. on reh=g); Tyler,
2006 WL 1452536, at*2.  However, a
prosecutor risks improperly striking at a defendant over the shoulder of
counsel when the argument refers to defense counsel personally and when the
argument explicitly impugns defense counsel=s character.  Mosley, 983
S.W.2d at 259; Guy v. State, 160 S.W.3d 606, 617 (Tex. App.CFort Worth 2005, pet. ref=d); Tyler, 2006 WL 1452536, at *2.  The court of criminal appeals has held that
the Aover-the-shoulder@ rule is designed to protect the defendant from improper prosecutorial
character attacks directed at defense counsel. 
Coble v. State, 871 S.W.2d 192, 205 (Tex. Crim. App. 1993), cert.
denied, 513 U.S. 829 (1994). 








In this case, the trial court denied Davis=s request to include in the jury charge an instruction on
self-defense.  Despite the trial court=s denial, during closing arguments Davis argued that he had acted in
self-defense in an effort to negate the intent element of the offense:  ABoth people got knifed.  Both
people are fighting and both people are going for the neck where the carotid
artery is, where the jugular vein is, and where someone is going to die if that=s cut.@  During its rebuttal to Davis=s closing argument, the State said, ALadies and gentlemen, if you look at this case and you look at all the
facts surrounding this case, there=s no evidence to suggest that Latarsha Hampton was armed.  Those are machinations drawn up by the
defense attorney.@  At that point, Davis=s attorney objected that such a statement attacked Davis over the
shoulders of defense counsel, violated his due process rights, and deprived him
of his right to a fair trial.  The trial
court overruled Davis=s objection,
and the prosecutor continued, AThere=s no
evidence to suggest that.@ 

Viewing the prosecutor=s statement in the context of the entire argument, the comment was
made in rebuttal, specifically in response to Davis=s claim that Latarsha was armed and had attacked Davis.  See Mosley, 983 S.W.2d at 256; York
v. State, No. PD-1753-06, 2008 WL 2677368, at *5 (Tex. Crim. App. July 2,
2008) (not designated for publication). 
By saying that the idea that Latarsha was armed was a Amachination[] [of] the defense attorney@ and continuing by emphasizing that there was no evidence presented to
support such a claim, the prosecutor was properly answering an argument of
opposing counsel.  See Felder, 848
S.W.2d at 94C95.








Case law supports this conclusion. 
For example, in Coble the prosecutor argued that the defense
attorney=s lawyer was arguing Asomething ridiculous.@  871 S.W.2d at 205.  The court of criminal appeals noted that such
a statement was not directed at defense counsel, but at defense counsel=s argument.  Id.  This stands in stark contrast to the cases
cited by Davis and other cases in which the appellate court has determined that
a prosecutor=s comment
did strike at the defendant over defense counsel=s shoulders.  See Gomez v.
State, 704 S.W.2d 770, 772 (Tex. Crim. App. 1985) (holding prosecutor=s argument that defense counsel was manufacturing evidence and thus
suborning perjury was improper); Lopez v. State, 500 S.W.2d 844, 846
(Tex. Crim. App. 1973) (holding prosecutor=s statement that defendant and defense counsel were lying when they
pleaded not guilty was improper); Guy, 160 S.W.3d at 616B17 (holding prosecutor=s statement that defense attorneys knew that a defendant accused of
cocaine possession lived in a Acrack house@ was
improper); Lopez v. State, 705 S.W.2d 296, 298 (Tex. App.CSan Antonio 1986, no pet.) (holding prosecutor=s argument that defense counsel=s goal was to keep evidence from the jury was improper).

Accordingly, we overrule Davis=s ninth point.

C.  State=s Argument Outside the Record

In his eighth point, Davis contends that the trial court erred by
denying his motion for mistrial made in response to an allegedly improper jury
argument by the State.  Specifically,
during its rebuttal in closing arguments, the State argued, 








[I]f
you remember when Officer Hatton was on the stand and testifying, he told you
he talked to -- he talked to Tanoah and he told you Tanoah told him that night
after my dad cut my momma, he then cut himself. 
She saw him cut the wrists.  So if
he=s
cutting his wrists, doesn=t it
make sense that, yes, he=s
cutting his neck. 

 

At this point, Davis objected that the prosecutor=s argument was outside the record. 
The trial court sustained Davis=s objection and instructed the jury to Adisregard the last statement.@  The trial court denied Davis=s subsequent motion for a mistrial. 
After the trial court overruled Davis=s motion for a mistrial, the prosecutor briefly remarked, AI implore you to remember the testimony of Officer Hatton,@ before continuing with a summation of the testimony from other
witnesses about Latarsha and Davis=s troubled relationship (a topic unrelated to who cut Davis=s neck). 

The purpose of closing argument is to assimilate the evidence to
assist the fact‑finder in drawing proper conclusions from the
evidence.  Gaddis v. State, 753
S.W.2d 396, 400 (Tex. Crim. App. 1988). 
The jury is then free to accept or reject such conclusions and
inferences.  Id. Counsel is
afforded virtually unlimited latitude in this regard as long as the argument is
supported by the evidence and made in good faith.  Porter v. State, 832 S.W.2d 383, 386
(Tex. App.CHouston [1st
Dist.] 1992, no pet.).








The record here reflects that, in fact, after a series of questions by
the prosecutor Officer Hatton was asked, AOkay.  So Tanoah indicated that
her daddy had cut her mom=s neck and
that her daddy had cut his own wrist?@  And Officer Hatton responded, AThat=s correct.@  Detective Graham also opined
that Davis=s neck wound
was self-inflicted.  Thus, the State=s argument quoted above was a reasonable deduction from the evidence
and did not interject any new or harmful facts into the record.  Accord Arnold v. State, 234 S.W.3d
664, 674 (Tex. App.CHouston [14
Dist.] 2007, no pet.) (holding State=s argument was proper deduction from evidence); DeLarue v. State,
102 S.W.3d 388, 406 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d) (same).  Accordingly, because
the State=s argument
was proper, Davis obtained more relief than he was entitled to when the trial
court sustained his outside-the-record objection and instructed the jury to
disregard the prosecutor=s last
statement.  See Reyes v. State,
No. 01-00-00688-CR, 2001 WL 463015, at *4 (Tex. App.CHouston [1st Dist.] May 3, 2001, no pet.) (not designated for
publication).  The trial court
consequently did not abuse its discretion by denying Davis=s motion for mistrial.  Id.  We therefore overrule Davis=s eighth point.

X. 
Evidence During the Punishment Phase








In his twelfth point, Davis contends that the trial court erred by
admitting a prior conviction because the State purportedly failed to link the
prior conviction to Davis.  During the
punishment phase of trial, the trial court admitted two exhibits offered by the
State regarding prior felony offenses that Davis had committed.  One exhibit (Exhibit 55) contained a judgment
against Davis for theft of a check between $750 and $20,000 in 1994.  In addition to the judgment, this exhibit
contained a picture of Davis and a set of Davis=s fingerprints.  A fingerprint
examiner testified that he had taken Davis=s fingerprints approximately fifteen minutes before testifying and
that he had matched the fingerprints from the pen packet in Exhibit 55 to
Davis.  Davis does not contest the court=s admission of Exhibit 55 into evidence.








The second exhibit admitted into evidence (Exhibit 56) contained a
judgment against a AJames
Anthony Davis@ for felon
in possession of a firearm in 1997.  This
exhibit contained only a judgment, a waiver form, and an Information.  It did not contain any descriptive or other
identifying information about the AJames Anthony Davis@ referred to in the judgment. 
However, the Information in Exhibit 56 specifically referenced the 1994
theft of a check case from Exhibit 55 by setting forth that case=s cause number.  Davis objected
when the State offered Exhibit 56 as evidence, saying that the State had failed
to establish that the Davis from that judgment was the same Davis on trial.
Davis urged that the State could not link him to the prior conviction because
there was no identifying information in Exhibit 56.  In response to the State=s argument, Davis argued at trial and in his brief to this court that
the Information in Exhibit 56 (which set forth the cause number from the
uncontested prior conviction evidenced by Exhibit 55) could not be used as
evidence to establish that he was the same person who committed both
crimes.  The trial court overruled Davis=s objection. 








Under the penal code, if, during the punishment phase of trial, the
State proves that the defendant has previously been finally convicted of two
felony offenses, then the defendant=s minimum punishment is enhanced to twenty-five years= confinement. Tex. Penal Code
Ann. ' 12.42(d)
(Vernon Supp. 2008).  To establish that a
defendant was convicted of an enhancement offense, the State must (1) prove the
existence of the conviction and (2) link the conviction to the defendant.  Martin v. State, 227 S.W.3d 335, 337
(Tex. App.CHouston [1st
Dist.] 2007, no pet.) (citing Beck v. State, 719 S.W.2d 205, 209B10 (Tex. Crim. App. 1986)).[7]  The State may establish a defendant=s previous conviction through certified copies of a judgment and
sentence (a pen packet).  Beck,
719 S.W.2d at 209.  However, the State
must provide independent evidence linking these documents to the defendant on
trial.  Id. at 210.  Therefore, a pen packet is inadmissible
unless it is joined with independent evidence that the person convicted of the
offense charged in the pen packet is the same person before the court.  Id.; Zimmer v. State, 989
S.W.2d 48, 51 (Tex. App.CSan Antonio
1998, pet. ref=d).

Whether the State meets its burden of linking the conviction to the
defendant is a matter of conditional relevancy. 
Smith v. State, 998 S.W.2d 683, 687 (Tex. App.CCorpus Christi 1999, pet. ref=d); Wright v. State, 932 S.W.2d 572, 576 (Tex. App.CTyler 1995, no pet.); Rosales v. State, 867 S.W.2d 70, 72 (Tex.
App.CEl Paso 1993, no pet.).  That
is, the relevance of a prior conviction is conditioned upon the production of
evidence sufficient to show that the defendants are one and the same.  Beck, 719 S.W.2d at 210B11; Smith, 998 S.W.2d at 687; Rosales, 867 S.W.2d at
72.  








This is not to say, however, that the State must provide such linking
evidence before a trial court can properly admit the pen packet; evidence
should not be excluded merely because its relevance may depend upon the
production of additional evidence at a later point in the trial.  Fuller v. State, 829 S.W.2d 191, 197
(Tex. Crim. App. 1992), overruled on other grounds by Castillo v. State,
913 S.W.2d 529, 537 (Tex. Crim. App. 1995); Yeager v. State, 737 S.W.2d
948, 951 (Tex. App.CFort Worth
1987, no pet.).  Therefore, when
authenticated copies of conviction records are offered into evidence to prove
that a prior conviction is part of a defendant=s prior criminal record, it is not essential that supporting
identification evidence precede the admission of the conviction evidence.  Beck, 719 S.W.2d at 210.  If, after all proof on the fact in question
has been received, and the evidence does not, in the aggregate, support a
rational finding that the defendant is the same person as the one previously
convicted, then the fact-finder should not be allowed to consider the evidence
of the conviction.  Smith, 998
S.W.2d at 688; see Fuller, 829 S.W.2d at 197; Beck, 719 S.W.2d at
210B11.  In the case of evidentiary
facts, it means that a motion to strike should be granted to withdraw the
evidence from consideration.  Fuller,
829 S.W.2d at 197; Smith, 998 S.W.2d at 688.








The court of criminal appeals has recognized several ways to link a
defendant to prior convictions.  See
Beck, 719 S.W.2d at 209B10.  One of the methods that the
court of criminal appeals has recognized is via the Atestimony of a witness who personally knows the defendant and the fact
of his prior conviction and identifies him.@  Id. at 209 (citing
Ward v. State, 505 S.W.2d 832 (Tex. Crim. App. 1974)).  Therefore, if the State offers conviction
records into evidence and establishes through the testimony of someone with
personal knowledge that the defendant on trial is the same person who was
previously convicted, the trial court does not err by allowing the jury to
consider the conviction for enhancing the defendant=s punishment.  Id.

In this case, Davis objected to State=s Exhibit 56 at the time of its admission because there was no
identifying information contained in the exhibit to link Davis to the prior
conviction.  At trial and on appeal,
Davis contends that the only connection between Davis and the exhibit was an
attached Information that referenced the cause number in a case that was linked
to Davis in Exhibit 55.  Davis urges that
the Information cannot be used as evidence linking him to a prior
conviction.  The State, however, offered
other independent evidence linking Davis to the felon in possession of a
firearm conviction through the testimony of Davis=s ex-wife, Jacqueline Anderson.

Jacqueline testified that she had personally known Davis since 1989,
was married to him for the first time in 2000, and was married to him again in
2002.  Jacqueline testified that she was
familiar with Davis=s criminal
history and knew about both the theft of a check conviction and the felon in
possession of a firearm conviction. 
Specifically, Jacqueline testified, without objection, as follows:

Q:     Jacqueline, are you familiar with the --
with James=
criminal history?

 

A.     Yes.

 








Q.     Are you aware of a theft or [sic] a check
case that he was 

convicted
for in 1990?

 

A.     Yes.

 

Q.     And actually went to the penitentiary for
it in 1994?

 

A.     Yes.

 

Q.     Is this the same James Davis who was
convicted in that 

case?

 

A.     Yes.

 

Q.     Are you familiar with an unlawful
possession of a firearm by a felon case
that he went to the penitentiary for?

 

A.     Yes.

 

Q.     In 1997?

 

A.     Yes.

 

Q.     And is this the same James Davis that was
convicted in that offense?

 

A.     Yes. 

 








Through this testimony of Davis=s ex-wife, who had known Davis since 1989 (well before the 1994 at
1997 convictions), had married him twice, and demonstrated personal knowledge
of Davis=s criminal history, the State established that Davis was the same
person previously convicted for felon in possession of a firearm in 1997.  See Beck, 719 S.W.2d at 209.  Linking Davis to a prior conviction made that
prior conviction relevant to the jury=s determination of appropriate punishment for Davis.  See Tex.
Penal Code Ann. ' 12.42(d);
Smith, 998 S.W.2d at 687; Wright, 932 S.W.2d at 576; Rosales,
867 S.W.2d at 72.  Therefore, the trial court
did not err by admitting Exhibit 56, and we overrule Davis=s twelfth point.

 

 

XI. 
Conclusion

Having overruled all of Davis=s points, we affirm the trial court=s judgment.

 

SUE
WALKER

JUSTICE

 

PANEL:  LIVINGSTON, WALKER, and
MCCOY, JJ.

PUBLISH

DELIVERED: August 26, 2008

 











[1]The
State argues that we should not perform a sufficiency analysis because
self-defense was not submitted to the jury. 
The State contends that we cannot review the sufficiency of a claim not
submitted to the jury.  Construing Davis=s
first two points liberally, as we must, we treat them as straightforward
challenges to the sufficiency of the evidence to support the jury=s
verdict finding him guilty of murder.  See
Tex. R. App. P. 38.1(e)
(requiring appellate court to treat issue as covering every subsidiary question
that is fairly included).





[2]Testimony
by Latarsha=s
mother and one of Latarsha=s friends established that
Latarsha went by Tasha. 





[3]Although
the legislature has since amended sections 9.31 and 9.32, the offense for which
the jury convicted Davis occurred on January 28, 2006, which was before the September
1, 2007 effective date of the amendments. 
Our analysis of Davis=s appeal is therefore
governed by the previous versions of these statutes.  See Act of June 19, 1993, 73rd Leg.,
R.S., ch. 900, ' 1.01,
sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 and Act of May 27, 1995, 74th
Leg., R.S., ch. 235, ' 1,
sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141, both amended by Act of March
27, 2007, 80th Leg., R.S., ch. 1, ' 5, 2007 Tex. Gen. Laws
1, 2 (codified as an amendment to Tex.
Penal Code Ann. ''
9.31, 9.32) (stating that an offense committed before the act=s
effective date is governed by the sections in effect when the offense was
committed).





[4]The
State points out that Dr. Peerwani was not asked Awhether
the cut could have resulted when Appellant, who was left-handed, wielded a
knife high up against his own throat so that the end of the knife cut his own
right ear.@  





[5]Testimony
was unclear as to whether there was one big neck wound or two smaller neck
wounds.





[6]Although
the trial court did not explicitly find that the statement was an excited
utterance (the trial court gave no basis for its overruling of Davis=s
objection), we nevertheless uphold the trial court=s
ruling on an evidentiary matter if it is correct on any theory of law
applicable to the case.  See McDuff v.
State, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997).





[7]Davis
does not attack the sufficiency of the evidence to prove the existence of a
prior conviction.  Therefore, we discuss
only the second of these two requirements.